IRVING AND MARY GOLUB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Golub v. Commissioner
Docket No. 11693-86.
United States Tax Court
T.C. Memo 1988-571; 1988 Tax Ct. Memo LEXIS 604; 56 T.C.M. (CCH) 870; T.C.M. (RIA) 88571; December 15, 1988
Frank L. Brunetti, for the petitioners. William S. Garofalo, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioners' Federal income tax for taxable year 1982 in the amount of $ 9,900 and an addition to tax for negligence which he since has conceded. After concessions, the issues remaining for decision are: (1) whether petitioners may dispute the characterization of certain payments as payments for consulting services and, if so, (2) whether such payments were for consulting services or for the sale of brokerage accounts. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioners *605 Irving and Mary Golub resided in Fort Lee, New Jersey, at the time they filed their petition in the instant case. Petitioner Irving Golub ("petitioner") began working in the wholesale candy business in 1936. From 1949 through 1976 petitioner was self-employed as a wholesale candy broker. Generally, candy brokers represent candy manufacturers in their sales to wholesalers in certain geographical areas pursuant to exclusive representation agreements that are terminable on 30 days notice. The representation agreements cover a particular geographical area and are generally, but not always, written. A candy manufacturer is commonly represented by one candy broker in any particular geographical territory for several years, as long as the manufacturer is not dissatisfied with the service provided by the broker and the broker does not represent competing companies making the same item (such as lollipops, gum, etc.). A broker's retention of his accounts depends upon the personal relationship of the broker with the respective manufacturer. Without that relationship, the manufacturer would terminate the account contract. The manufacturer's consent is required for transfer of an account. *606 In the first 10 months of 1976, petitioner received $ 135,713 in gross commission income from his candy brokerage business. Petitioner carried on that business as a sole proprietorship. At the start of 1976, petitioner had two employees in the candy brokerage business. One employee died in 1976, and petitioner, due to his age, found himself unable to cope with the demands of the business. Ferolie Corporation Food Brokers ("Ferolie") [1] is a broker in a number of different lines, including candy. During 1976 petitioner and Ferolie began discussions over the acquisition of petitioner's candy accounts by Ferolie. Negotiations continued for several months. During the negotiations, a proposal ("the proposal") was drafted which stated in relevant part: Terms that should be agreed upon: 50,000 [dollars] per year plus 1% over *607 2 million [dollars] in volume [of gross sales from petitioner's accounts] for 5 years. For the next five years IWG [petitioner] will act as a consultant at 20,000 [dollars] per year. If IWG decides to retire before the first 5 year contract expires Feroli[e] will pay him only 25,000 [dollars per year] for the remaining years of the unused part of the contract. If IWG expire [sic] before the 1st part of the contract Feroli[e] agrees to pay IWG heir 25, [sic] per year of the unused part of the 1st part of the 5 yr. contract. Feroli[e] will supply IWG with office in which to function. Petitioner eventually met with Lawrence Ferolie ("Mr. Ferolie"), president of Ferolie. Mr. Ferolie subsequently offered petitioner a written agreement ("the agreement") which was based substantially upon the proposal. Petitioner reviewed the agreement overnight and then signed it on October 22, 1976. The agreement provides, in relevant part, as follows: The following is a memorandum of our agreement: Ferolie agrees to pay you $ 50,000 per year for the first five years. Ferolie also agrees, during this period of time, to furnish you with a car and pay all your reasonable *608 expenses connected with Ferolie Corporation's candy business. After five years, Ferolie agrees to pay you $ 20,000 per year to act as a consultant for an additional five years. In return, you, Irving Golub, agree to turn over all your present and future accounts to the Ferolie Corporation, which you warrant as being in excess of $ 100,000 per year. In addition during the first five year period, Ferolie Corporation agrees to pay you as a bonus an additional 10 percent of the gross commissions over $ 100,000 attributable to those principals you presently have. If you, Irving Golub, are unable to work or wish to retire any time during the first five years, Ferolie Corporation will pay you $ 25,000 per year for the remainder of that first five years, during which time you will act as a consultant. As part of this agreement, it is hereby agreed that if Irving Golub dies at any time during the first five years, this contract will end and Ferolie Corporation agrees to pay his heirs $ 25,000 per year for the remainder of the first five years. This agreement shall remain in effect for as long as there is sufficient income from the accounts you are turning over to the Ferolie Corporation *609 to cover your salary and expenses. It is agreed that any income from the said accounts is to be applied first to the payment of your salary. The file cabinets, records, and automobile used by petitioner in carrying on his candy brokerage business were not transferred to Ferolie under the agreement. Petitioner's accounts receivable with respect to his candy brokerage business also were not transferred to Ferolie. For the first five-year period under the agreement, petitioner was employed by Ferolie. During that period of time petitioner serviced accounts acquired by Ferolie pursuant to the agreement, as well as other Ferolie accounts. After the first five-year period, petitioner performed few services directly for Ferolie and was employed by the C. Howard Company, a customer of Ferolie. At the time the agreement was signed, Mr. Ferolie had intended to call upon petitioner for consulting services during the second five-year period under the agreement in the event that such services might be necessary. In fact, Mr. Ferolie did not require such services, because some of the accounts that Ferolie acquired from petitioner eventually terminated business with Ferolie after petitioner *610 left Ferolie's employment and the remainder of the accounts Ferolie acquired from petitioner generally were being serviced successfully by other Ferolie employees. Ferolie paid petitioner $ 50,000 each year, plus expenses, during the first five-year period under the agreement and $ 20,000 each year during the second five-year period under the agreement. On his 1982 income tax return, petitioner reported the $ 20,000 received from Ferolie in 1982 as a long-term capital gain and deducted $ 12,000 under section 1202 as a net capital gain deduction. OPINION We must decide whether the $ 20,000 paid to petitioner by Ferolie in 1982 is taxable as capital gain or as ordinary income. The parties do not dispute that if the amount paid to petitioner is characterized as an amount received in exchange for the brokerage accounts transferred by petitioner to Ferolie, it is taxable as capital gain and if the amount paid to petitioner is characterized as compensation for consulting services, it is taxable as ordinary income. Respondent first contends that petitioners should be prohibited from challenging the agreement's characterization of the payments as compensation for consulting services. *611 Petitioners contend the agreement is ambiguous on its face and that they should therefore be allowed to characterize such payments as receipts in exchange for the sale of brokerage accounts. The ability of a taxpayer to avoid the form of a transaction requires strong proof in this Court, and is even more restricted by the Court of Appeals for the Third Circuit. , affd. in an unpublished order . In , vacating and remanding , the rule in the Third Circuit was enunciated as follows: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or show its unenforceability because of mistake, undue influence, fraud, duress, etc. Although Danielson involved the allocation of payments to a covenant not to compete, it *612 is clear that the rule applies beyond the confines of such an allocation. ; Venue for appeal in the instant case lies in the Third Circuit, so we are constrained to follow Danielson. affd. . In the instant case, petitioners have not claimed the existence of mistake, undue influence, fraud or duress, and no evidence of such circumstances has been offered. In fact, we think it is clear that the agreement was negotiated at arm's length between petitioner and Ferolie and was based upon the proposal. Although petitioner testified that he had never seen the proposal until just prior to trial, his testimony was contradicted by several Ferolie employees, who testified that petitioner prepared the typed portion of the proposal and submitted it to Ferolie during the course of the negotiations. Additionally, the typed portion of the proposal contains numerous errors, including several misspellings of "Ferolie." It thus appears unlikely that the proposal was typed *613 by any Ferolie employee. The Ferolie employees also testified that handwritten comments were added later by various Ferolie employees, and some of those comments contradict or question the proposal.[2] In short, we find that petitioner's testimony is not credible on this issue. Based on the foregoing, we find that petitioner drafted the proposal and submitted it to Ferolie during the negotiations and that petitioner entered into the agreement with a clear understanding of its substance and content. Cf. (quoting . Petitioners nevertheless argue that the rule in Danielson is inapplicable to the instant case because the agreement in issue is ambiguous. Petitioners rely on the following language from our opinion in : We think the language of the agreement is permeated with ambiguity and, accordingly, *614 the Danielson rule does not apply. * * * In order to hold contracting parties to their written agreement, the Danielson rule impliedly requires an unambiguous agreement. Where an agreement is permeated with ambiguity, as in the instant case, we think the Danielson rule is inapplicable. * * * Our conclusion is consistent with the way this Court has treated ambiguity in a contract in "strong proof" cases. Where "Neither party seeks to vary the terms of the contract [and] * * * both merely attempt to construe an obviously ambiguous term of the contract in a light most favorable to their respective causes," the strong proof doctrine is inappropriate. * * * [Citations and fn. refs. omitted.] Respondent does not dispute the principle enunciated in the foregoing quotation from Smith. Respondent, however, adds that the foregoing principle should be read in connection with the following language also contained in Smith:
we find the requisite ambiguity within the "four corners" of the agreement. * * * we find the [contract] language irreconcilable and hence ambiguous *615 when the original agreement and addendum are applied and interpreted together. . Our opinion in Smith is clear that the ambiguity therein was found within the four corners of the contract. Thus, Danielson was inapplicable and parol evidence was admissible to construe the ambiguous provision of the contract. In the instant case we find that there is no ambiguity within the four corners of the agreement with respect to the treatment of the $ 20,000 payment in 1982. The second paragraph of the agreement unambiguously states that "Ferolie agrees to pay [petitioner] $ 20,000 per year to act as a consultant for an additional five years." The last paragraph similarly states that the amounts are "salary." [3]
*616 Petitioners rely on two arguments to show the ambiguity in the agreement. The first argument is based upon testimony and the second argument centers on the "death benefit" contained in the fifth paragraph of the agreement. Petitioners' first argument misses the point of Smith. In the instant case, because there is no ambiguity appearing within the four corners of the agreement, we are unable to find that Danielson is inapplicable. Petitioners have cited no authority for the proposition that we may look to testimony or any evidence outside the agreement to provide the ambiguity. Thus, petitioner's first argument fails. Petitioners also argue that the existence of a death benefit makes the agreement ambiguous. The "death benefit" contained in the agreement provides that if petitioner dies during the first five years of the agreement Ferolie will pay petitioner's heirs $ 25,000 per year for the then remaining years in that five-year period. Petitioners suggest that such a benefit "does not make good business sense" and must be in return for "something else of a substantial nature." Assuming arguendo that the death benefit is indeed for "something else," and not merely *617 a guaranteed signing bonus or other payment in connection with an employment contract, petitioners' argument with respect to the death benefit does not further their position in this case. To the extent the death benefit was for "something else," that something else only could be consideration for the goodwill value of the candy accounts. [4] That the amount of the death benefit might have been consideration for the candy account business, however, in no way renders ambiguous the provisions in the agreement relating to the payments during the second five years of the agreement, including the $ 20,000 herein at issue. Petitioners' argument that the death benefit was in return for "something else" in fact implies that any payments in excess of the death benefit, i.e., the additional $ 25,000 due during each of the first five years of the agreement plus all payments due during the second five years, were compensation for petitioner's services inasmuch as payments beyond the death benefit were not guaranteed and were contingent upon petitioner's survival, his ability to work, and his not wishing to retire. The existence of the death benefit serves only to support the agreement's characterization *618 of payments during the second five-year period as being for consulting services, and does not render the agreement ambiguous as to the characterization of the $ 20,000 at issue. [5]
Petitioners also argue that respondent may not invoke the parol evidence rule when respondent is not a party to the agreement. Such a prohibition has been described as the "third-party to the instrument rule" and may be invoked in this Court in certain situations (see , affd. ; *619 however, the opposite result follows when the Danielson rule applies ( ). Under the Danielson rule, the Commissioner steps into the shoes of a party to the instrument and is no longer a third person. The Danielson rule thus is a parol evidence rule which may be asserted by the Commissioner. ; . Thus, the third-party to the instrument rule has been rejected in cases, such as the instant one, that are appealable to the Third Circuit and subject to the Danielson rule. Our holding obviates the need to consider the other arguments advanced by petitioner. We have construed the agreement as unambiguously requiring payments to petitioner in 1982 for services [6] as a consultant, and those payments are taxable to petitioners as ordinary income. *620 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. It appears that in 1976 or 1977 the Ferolie Corporation was reorganized from a single corporation with several operating divisions into a parent company with several subsidiaries. For purposes of the instant case, Ferolie's form is immaterial and we shall refer to the Ferolie Corporation and its successor corporations collectively as "Ferolie".↩
2. We also find that the proposal is consistent with the agreement, as it also characterizes the $ 20,000 payments for 1982 through 1986 as payments for consulting.↩
3. The facts herein arguably might be even less favorable to petitioners than the facts in Danielson were to the taxpayers therein. The agreement in Danielson↩ specified that the stock being sold thereby had a given value, but the agreement in the instant cases gives no recitation of any value for any goodwill or for any other value attributable to the candy account business. All the language in the instant agreement speaks in terms of Ferolie's payments being for petitioner's working or acting as a consultant. The agreement contains no language whatsoever to indicate that any portion of Ferolie's payments was for any goodwill or other asset, rather than solely for petitioner's services.
4. We note that petitioners have introduced no evidence to indicate that the goodwill value of the candy accounts might have approached the total $ 125,000 ($ 25,000 annually for five years) death benefit. ↩
5. Even if we were to consider the testimony adduced at trial suggesting that petitioner actually performed no services during the second five-year period under the agreement, such evidence would not necessarily be inconsistent with an employment contract. The $ 20,000 payments could be viewed as either deferred compensation or annual retainers. Cf. .↩
6. Petitioner does not suggest that the agreement would not have been enforceable by Ferolie so as to require petitioner to perform consulting services if required by Ferolie.↩